**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                    **Case No. 8:26-cr-00041-TPB-CPT**

**JEREMY RYAN**

_____/

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO GAG ORDER ON SEARCH AND SPEECH RESTRICTIONS

The Defendant, Jeremy Ryan, by and through his attorney, pursuant to the First, Fifth, and Sixth Amendments to the United States Constitution and 18 U.S.C. § 3142, objects to the Court's gag order (Doc. 26) prohibiting him from searching or posting about the victims, the witnesses, the judicial officers, counsel for the government, and law enforcement officers, and their respective family members during the pendency of his case as a prior restraint on his rights to freedom of speech, to seek and obtain knowledge, to prepare his own defense, and to assistant his counsel in the preparation of his defense. In support thereof, Mr. Ryan states and argues as follows:

### I.    Introduction.

The Court's gag order prohibiting Mr. Ryan from posting about or even searching for information about the victims, the witnesses, the judicial officers, the prosecutors, the law enforcement officers involved in this case, including

1

their respective family members, constitutes an impermissible prior restraint on core First Amendment expression. While courts possess authority under the Bail Reform Act to impose reasonable conditions of release, those conditions must be narrowly tailored and cannot unnecessarily infringe on a defendant's constitutional rights under the First, Fifth and Sixth Amendments.

## II.     Facts and procedural history.

On December 12, 2025, a complaint was issued against Mr. Ryan for allegedly transmitting threats in interstate commerce to injure the person of another in violation of 18 U.S.C. § 875(c). Doc. 1. The alleged threats were communicated via text message in a three-way conversation between Mr. Ryan, Victim 1, and Witness 1 regarding "business ventures in the crypto currency industry." *Id.* at ¶ 7. The conversation soured and Mr. Ryan purportedly sent a string of messages that went unanswered, *id.* at ¶ 13, amounting to what the SA Richard Volp believed were threatening communications, *id.* at ¶¶ 28, 29. An arrest warrant was issued, and Mr. Ryan was taken into custody in the Southern District of California (San Diego) on January 23, 2026. United States v. Ryan, 3:26-mj-139-BJW (S.D. Cal.). His Rule 5 proceedings were continued to January 27. (Doc. 3). On January 27, Mr. Ryan was appointed counsel and the government moved for his detention on the grounds of flight and danger to the community;

2

Mr. Ryan was detained pending his request to continue the detention hearing until January 30. *Id.*, (Docs. 7, 8, 10).

Three days later, the presiding magistrate, Judge Barbara Lynn Major, conducted a detention hearing; she ordered Mr. Ryan detained and continued the matter to February 10 to conduct an identity hearing. *Id.*, (Docs. 12, 13). On February 10, the hearing was called but Mr. Ryan was in the hospital and couldn't appear; the hearing was continued to February 19. *Id.*, (Doc. 14). Eight days later, Mr. Ryan moved for reconsideration of detention because of his health complications. *Id.*, (Doc. 15). On February 19, Mr. Ryan waived his identity hearing and was granted pretrial release with strict conditions, including a no-contact order for Victim 1, Witness 1, and their family members; a no-doxing order for Victim 1 and his family, Witness 1 and his family, law enforcement, and the prosecutors; and computer monitoring for one approved device. *Id.*, (Doc. 17). On February 24, the parties reconvened and the court modified Mr. Ryan's pretrial release conditions, permitting him one device with computer monitoring and broadening the no-contact order to include the "victims' companies or any agencies that the victims' companies contract with." *Id.*, (Doc. 21).

Meanwhile, back in Tampa, Mr. Ryan was indicted on February 4 for one count of cyberstalking in violation of 18 U.S.C. § 2261A(a)(A) and (B). Doc. 3. Mr. Ryan waived his appearance for arraignment, Doc. 7, and the Court granted his

3

motion, Doc. 9. The Court appointed counsel for Mr. Ryan, Doc. 8, and he was arraigned on the indictment on March 12, Doc. 12. The next day, the Court set the matter for a status conference on March 19 with no notice as to the purpose or nature of the hearing and ordering Mr. Ryan's presence. Doc. 13. Immediately the same day, Mr. Ryan moved for time-sensitive relief to appear telephonically or virtually. Doc. 14. Four days later, the Court denied the motion. Doc. 15. Mr. Ryan moved for time-sensitive reconsideration to appear telephonically or virtually, Doc. 16, and the Court denied the motion, Doc. 17.

In the interim, counsel diligently inquired about the nature of the hearing. It wasn't until March 18, a day before the status conference, counsel conferred with prosecutor for the government; then and only then, did counsel have some semblance for the nature of the hearing. Apparently, there was some "concerning" information that came to pretrial services' attention, but that there hadn't been any violations of Mr. Ryan's pretrial release conditions. Some weeks prior, Mr. Ryan had made two Facebook posts with links to articles that had been previously written—these posts didn't amount to doxing. In addition, while monitoring Mr. Ryan's phone, there were a string of search queries—observed through computer monitoring of his phone. But details were scant.

On  March 19, the parties convened for the status conference as scheduled with Mr. Ryan and a local pretrial services officer appearing in person before the

4

presiding magistrate, Judge Christopher P. Tuite; Mr. Ryan's pretrial services officer in San Diego appeared by phone. Doc. 22. Pretrial Services had previously drafted an "informational memorandum" on March 10 outlining their concerns with Mr. Ryan's internet access and search queries and requested a status conference be held.

The memo spoke very generally of internet searches that Mr. Ryan had conducted about the presiding magistrate judge and the prosecutor — nothing specific. He had also searched for the alleged victim's name, information, and residence location. He also discussed things about the alleged victim in chats, posted social media links related to the victim (without doxing him), and visited Facebook pages that the victim had posted on. Mr. Ryan also created a fake social media profile under a pseudonym. (He later changed it to reflect his real name). The March 10 informational memo was never disclosed to counsel prior to the status hearing.[1] None of this amounted to any kind of pretrial release violation.

Pretrial Services sought to modify Mr. Ryan's pretrial release condition to include a full internet ban.[2] Judge Tuite then informed the parties and went into

---

[1] At the start of the status hearing, Counsel was also provided approximately 150 pages of screenshots depicting Mr. Ryan's monitored phone activity. The Court permitted counsel ample time to review the memo and the screenshots.

[2] Pretrial Services also sought to change his electronic monitoring, from radio frequency to GPS. Mr. Ryan was worried about the impact GPS monitoring would have with his implantable cardioverter-defibrillator, which acts as a pacemaker and shocks his heart. Mr. Ryan's doctors wrote letters on his behalf, medically clearing him to be on a GPS monitor. Doc. 28.

greater detail about the searches that Mr. Ryan had performed. He searched whether there were any ties between the judicial officers and the prosecutor to Jeffrey Epstein, the infamous child sex trafficker. Wikipedia, *Jeffrey Epstein*, https://en.wikipedia.org/wiki/Jeffrey_Epstein (last visited March 30, 2026).[3] The Court questioned the relevance Jeffrey Epstein had to the litigation, and counsel tried to explain that connection—the Court didn't seem persuaded.[4] Still, counsel raised objections to restricting Mr. Ryan's right to search for information such as this—or any other kind of information for that matter—to investigate his criminal case on his own, without his counsel's assistance. Judge Tuite tried to compare Mr. Ryan's case to that of a defendant charged with possessing, receiving, or distributing child pornography and the conditions of pretrial release that are mandated by the Adam Walsh Act. Counsel argued that a child pornography case is a poor comparator the crime Mr. Ryan is accused of committing. In the end, Judge Tuite modified Mr. Ryan's pretrial release conditions and entered an endorsed order, adding the following condition (the one that's pertinent here):

> Defendant shall not conduct any internet searches or make any posts
> relating to the victims in this case and their families, the witnesses in this
> case and their families, the victims' or witnesses' businesses/companies or

---

[3] https://perma.cc/SB2N-PT8S.

[4] Mr. Ryan had written an article about Witness 1's verifiable ties to Jeffrey Epstein and gave him a day's notice that he would post the article. Coincidentally, a day later, a complaint was drafted against Mr. Ryan for transmitting threats in interstate commerce, and he was promptly arrested.

> any entities or persons contracting with the victims' or witnesses'
> businesses/companies, law enforcement and prosecutors involved in this
> case and their families, and judicial officers involved with this case and
> their families.

Doc. 26. Mr. Ryan objected to this additional condition on First Amendment grounds. Judge Tuite ordered supplemental briefing on the matter. Doc. 27. This supplemental motion opposing the Court's gag order soon followed.

### III.   The gag order violates Mr. Ryan's rights under the First Amendment.

A quick prologue on the law for Mr. Ryan's First Amendment claim. One case that he heavily cites and relies upon in his memorandum opposing the Court's gag order is *United States v. Donald J. Trump* out of the D.C. Circuit. There hasn't been a more consequential, meticulous, and well-reasoned opinion quite like this in recent memory. The opinion discusses the state of the law on prior restraints against a criminal defendant's out-of-court speech and which test to apply. It's highly persuasive authority. Here in the Eleventh Circuit, the one district court case that's on all fours is *United States v. Leon Carmichael, Sr.* out of the Northern Division of Alabama. It predates *Trump* by nearly 20 years. Judge Myron H. Thompson arrives at the same legal conclusions as the D.C. Circuit. Her opinion is highly persuasive but won't be discussed in as much depth.

"A defendant's ability to speak about his criminal trial is an important issue given the First Amendment's broad protection of free speech and the public

interest in the transparency of criminal trials and open discussion of the trial process." *United States v. Trump*, 88 F.4th 990, 1001 (D.C. Cir. 2023) (citing *Sheppard v. Maxwell*, 384 U.S. 333, 349–50 (1966)).

> The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations. *See, e.g.*, *Landmark Commc'ns, Inc.* 435 U.S. at 838–39. "It would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980). Public vigilance serves us well, for "the knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power. . . . Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *In re Oliver*, 333 U.S. 257, 270–71 (1948).

*Gentile v. State Bar of Nebraska*, 501 U.S. 1030, 1035 (1991). In that same vein, "courts and the judges who sit on them enjoy 'no greater immunity from criticism than other persons or institutions.' " *Trump*, 88 F.4th at 1025 (quoting *Landmark Commc'ns, Inc. v. Virgina*, 435 U.S. 829, 839 (1978) and *Bridges v. California*, 314 U.S. 252, 289 (1966) (Frankfurter, J., dissenting)).

In a broad sense, the Bail Reform Act as codified in 18 U.S.C. § 3142 contemplates a plethora of pretrial release conditions that district courts may be impose against a defendant—such as placing them on electronic monitoring or preventing them from speaking to potential witnesses—that must be the least restrictive to ensure the safety of the community and the defendant's presence in court:

8

Criminal defendants are frequently subjected to "substantial liberty restrictions as a result of the operation of our criminal justice system." *United States v. Salerno*, 481 U.S. 739, 749 (1987). More specifically, as a less restrictive alternative to pre-trial detention, Congress granted courts the authority to release indicted defendants under the "least restrictive condition, or combination of conditions of release, that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). Such conditions commonly include measures that burden criminal defendants' ability to act, associate, and speak. *See id.* § 3142(c)(1)(B)(i)–(xiv); *see also* George E. Browne & Suzanne M. Strong, U.S. Dep't of Just. Bureau of Just. Stat., Pretrial Release and Misconduct in Federal District Courts, Fiscal Years 2011–2018, at 7 table 5 (2022); Amber Widgery, Nat'l Ass'n of State Legislatures, The Statutory Framework of Pretrial Release 5 (2020) (describing "limitations on contact with certain people, groups or places" and "adherence to or creation of protection or no-contact orders" as common statutory options for pretrial release conditions among States).

As relevant here, Congress expressly authorized federal courts to order a criminal defendant to "avoid all contact with . . . a potential witness who may testify concerning the offense." 18 U.S.C. § 3142(c)(1)(B)(v); *cf. United States v. Perazza-Mercado*, 553 F.3d 65, 70–71 (1st Cir. 2009) (canvassing different circuits' approach to internet restrictions as a condition of supervised release and concluding such restrictions may be imposed upon a showing of particular need).

*Trump*, 88 F.4th at 1006 (cleaned up and citations and footnotes omitted). But a no-contact order prohibiting a defendant from talking to potential witnesses is vastly different than a gag order preventing a defendant from searching or speaking *about* potential witnesses, including the alleged victim. The former is constitutionally permissible while the latter is presumptively unconstitutional because it's a prior restraint on protected First Amendment speech. *Trump*, 88 F.4th at 1004 (citing *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976)). The same goes for gag orders prohibiting a defendant from searching or posting

9

about judicial officers, prosecutors, and law enforcement. *See Trump*, 88 F.4th at 1008. "Working in the criminal justice sphere fairly requires some thick skin." *Id.* at 1027.

"Prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press*, 427 U.S. at 558. "A prior restraint . . . has an immediate and irreversible sanction. If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech," prior restraint 'freezes' it at least for a time." *Id.* (footnote omitted). "Any system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity." *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (internal citations and quotations omitted); *Trump* 88 F.4th at 1004 (stating that "court orders restraining speech about an ongoing criminal proceeding are presumptively unconstitutional") (citing *Nebraska Press*, 427 U.S. at 558). "The Government thus carries a heavy burden of showing justification for the imposition of such a restraint." *New York Times Co.*, 403 U.S. at 714 (internal citation and quotations omitted).

It's important to mention at the outset that the Supreme Court hasn't squarely addressed this issue and the extent to which a district court may restrain a criminal defendant's speech during the pendency of their case and which standards apply. *Trump*, 88 F.4th at 1007. It also appears to be an open

10

question in the Eleventh Circuit. *United States v. Carmichael*, 326 F. Supp. 2d 1267, 1293 (N.D. Ala. 2004). That doesn't mean the court is powerless to act. In criminal trials, restraining the speech of the media, trial participants, or other outsiders is sometimes necessary "to protect the trial process and its truth-finding function." *Trump*, 88 F.4th at 1001, 1006. Still, courts must strike a balance between these restraints on speech and the need to protect the fair and orderly administration of justice using the least restrictive alternatives to protect this compelling interest. *See Trump*, 88 F.4th at 1008–09.

The D.C. Circuit in *Trump* looked to three factors as a starting point to restrain a criminal defendant's speech: "(1) whether the Order is justified by a sufficiently serious risk of prejudice to an ongoing judicial proceeding; (2) whether less restrictive alternatives would adequately address that risk; and (3) whether the Order is narrowly tailored, including whether the Order effectively addresses the potential prejudice." 88 F.4th at 1007 (citing *Nebraska Press*, 427 U.S. at 562; *Gentile*, 501 U.S. at 1075–76). But the factors didn't stop there. The D.C. Circuit also had to determine what the degree of danger was to the judicial process and which test to employ before a district court could issue a gag order against a criminal defendant. *Trump*, 88 F.4th at 1008. Is it the more demanding "clear and present danger" test, which restrains the media's speech as discussed in *Nebraska Press*? Is it the laxer "substantial likelihood of material prejudice" test,

which restrains a criminal lawyer's speech to the judicial proceedings as explored in *Gentile*? Or is it some other test?

The D.C. Circuit had to acknowledge that "a criminal defendant—who is presumed to be innocent—may very well have a greater constitutional claim than other trial participants to criticize and speak out against the prosecution and the criminal trial process that seek to take away his liberty." *Id.* But the court also "recognized the district court's authority to control the speech and conduct even of defendants in criminal trials when necessary to protect the criminal justice process." *Id.* at 1006. "The Supreme Court," said the D.C. Circuit, "has instructed courts that when they are imposing orders restricting speech about judicial proceedings, they must in all cases consider both 'the imminence and magnitude of the danger' to the judicial process that flows from the speech and 'the need for free and unfettered expression.' " *Id.* at 1007 (citing *Landmark Commc'ns*, 435 U.S. at 843). The court then "assume[d] without deciding that the most demanding scrutiny applies to the district court's speech-restricting Order," and applied the "significant and imminent threat" test, which restrains a defendant's speech to protect the administration of justice, which was further explored in *Landmark Communications. Id.* at 1008. So where does that leave us in Mr. Ryan's case?

The Court's gag order doesn't pass constitutional muster in any way, shape, or form. It stalls right out of the gate with the first factor, stumbles over

itself on the second factor, and falls completely flat on its face on the third factor. The gag order isn't justified by a sufficiently serious risk of prejudice to the judicial proceedings. Since there isn't a sufficiently serious risk of prejudice, the Court shouldn't have issued the gag order in the first place. Since there's no risk to address, there isn't a need to consider the least restrictive alternatives. In fact, the least restrictive alternative is *lifting* the gag order in full. And there isn't a tailoring issue here because the potential prejudice to the judicial proceedings approaches a number nearing zero. The Court's gag order is a blanket restriction on Mr. Ryan's right to search and post about *anything* about the judicial officers, the prosecutor, and law enforcement. (If that's not far sweeping, then I don't know what is.) Compare Mr. Ryan's case to that of Trump's.

It's safe to say that, as a criminal defendant, Jeremy N. Ryan doesn't hold a candle to Donald J. Trump when he was a criminal defendant a few years back. Mr. Ryan doesn't have any kind of notoriety or any kind of clout like Trump had when he was running for political office and was accused of inciting an insurrection. Mr. Ryan doesn't control the whims of a political party, he doesn't have any kind of sway over the media, and he doesn't have the hearts and minds of almost half the voting population. Heck, he doesn't have his own social media company.

Trump went after "known and potential witnesses." *Trump*, 88 F.4th at 1010. He tried to interfere with potential witnesses during the grand jury proceedings. *Id.* He used his Truth Social as a platform to deride and discredit cooperating witnesses. *Id.* He chided the trial judge as "biased, a fraud, and a hack." *Id.* (cleaned up). He called Jack Smith, the Special Counsel, deranged and a lunatic." *Id.* at 1011 (cleaned up). Those on the receiving end of his attacks relating to the 2020 election had "real-world consequences" that subjected these outsiders and potential witnesses "to a torrent of threats and intimidation from his supporters." *Id.* The D.C. Circuit goes on and on, concluding that " Mr. Trump's documented pattern of speech and its demonstrated real-time, real-world consequences pose[d] a significant and imminent threat to the functioning of the criminal trial process . . . in two respects." *Id.* at 1012.

As to the first factor, whether the Order is justified by a sufficiently serious risk of prejudice to an ongoing judicial proceeding, the D.C. Circuit determined that Trump's messages about potential witnesses' participation in the case "pose[d] a significant and imminent threat to individuals' willingness to participate and fully and candidly in the process, to the content of their testimony and evidence, and to the trial's essential truth-funding function." *Id.* Second, the D.C. Circuit determined that some of Trump's speech "about counsel and staff working on the case pose[d] a significant and imminent risk of

14

impeding the adjudication of th[e] case," which could "generate alarm and dread," "trigger extraordinary safety precautions," "hinder the trial process and slow the administration of justice." *Id.* at 1014. The D.C. Circuit reasoned that the trial court "had a duty to act proactively to prevent the creation of an atmosphere of fear or intimidation aimed at preventing trial participants and staff from performing their functions within the trial process." *Id.* The D.C. held that the record "establishe[d] the imminence and magnitude, as well as the high likelihood, of harm to the court's core duty to ensure the fair and orderly conduct of a criminal trial and its truth-finding function." *Id.* at 1016.

As to the second factor, whether less restrictive alternatives would adequately address that risk, the D.C. Circuit held that there were no other least restrictive alternatives: "No less-speech-restrictive alternative could viably protect against the imminent threat to the participation of witnesses, trial participants, and staff in this criminal matter, or the full, fair, and unobstructed receipt of relevant evidence." *Id.* at 1017 (citations omitted). The trial court tried a least restrictive alternative — voluntary compliance "against speech that would prejudice the trial press." *Id.* But Trump didn't heed the lower court's warning." *Id.* The trial court also considered other alternatives, such as questioning prospective jurors during voir dire, moving the trial to another district, or delaying the trial until after the election, but all of these alternatives couldn't

15

overcome the mountain of perceived and very real prejudice. *Id.* at 1017–18. The D.C. Circuit held that there were no other alternatives to address the risk of prejudicing the proceedings. *See id.* at 1018.

As to the third factor, whether the order is narrowly tailored to effectively addresses the potential prejudice, the D.C. Circuit held that there was a tailoring issue with the trial court's gag order: "While the district court had the authority to issue an order restraining trial participants' speech, and no less restrictive alternative would suffice, the Order is not narrowly tailored to maximize the amount of protected speech allowed while still averting the substantive evil of unfair administration of justice." *Id.* at 1019 (cleaned up and citations and internal quotations marks omitted). The D.C. Circuit quoted the order in full:

> All interested parties in this matter, including the parties and their counsel, are prohibited from making any public statements, or directing others to make any public statements, that *target* (1) the Special Counsel prosecuting this case or his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting personnel; or (4) any reasonably foreseeable witness or the substance of their testimony.

*Id.* (emphasis added). The court reasoned that the word "target" swept too broadly and "capture[d] some constitutionally protected speech that lacks the features or content that would trench upon the court's proper functioning or ability to administer justice." *Id.*

The tailoring issue for restraining Trump's speech against witnesses can be summed up nicely with the following quote from the D.C. Circuit: "The interest

in protecting witnesses from intimidation and harassment is doubtless compelling, but a broad prohibition on speech that is disconnected from an individual's witness role is not necessary to protect that interest." To reduce the sweeping nature of the gag order, the lower court should have focused "more directly and narrowly on comments that speak to or are about those persons' potential participation in the investigation or in th[e] criminal proceeding." *Id.* at 1021.

In terms of prohibiting Trump from making any public statements against the prosecutors and court staff, the D.C. Circuit also reasoned that the gag order went too far and needed "recalibration." *Id.* at 1025, 1026. "Prosecutors are vested with immense authority and discretion," and "criminal defendants facing potential curtailments of liberty have especially strong interests in commenting, within reasonable bounds, on prosecutors' use of their power." *Id.* at 1025. The same can be said of judges and courts, which enjoy "no greater immunity from criticism than other persons or institutions." *Id.* (citations omitted). The gag order also went too far in restricting speech about the Special Counsel, who was "no more entitled to protection from lawful public criticism than [ ] the institution he represents." *Id.* at 1026 (citations omitted). As far as court staff, the D.C. Circuit added a *mens rea* to balance "the court's institutional interests and the free speech values at stake." *Id.*

Let's talk about *United States v. Carmichael* for a minute here. Carmichael was charged with drug conspiracy and money laundering. 326 F. Supp. 2d at 1270. Shortly after his arrest in December 2023, Carmichael setup a website on the internet that said at the top of the page" 'Wanted' in large, red letters, beneath which are the words 'Information on these Informants and Agents.' " *Id.* Below that were the words " 'Agent' or 'Informant,' " and a list of their names and their photographs that Carmichael believed were involved in his case. *Id.* There was a statement that followed, requesting those with information to contact Carmichael's lawyers. *Id.* A picture of the website also appeared on a full-page ad in the local paper. *Id.* at 1272–73.

The government moved for a protective order seeking to restrict Carmichael from posting statements about the identity, testimony, or credibility of prospective witnesses and informants, *id.* at 1273, and that the website amounted to intimidation and harassment, *id.* at 1275–76. Carmichael challenged the protective order on First Amendment grounds. *Id.* at 1276. The district court treated the proposed protective order as a prior restraint on Carmichael's speech. *Id.* at 1291. Like the D.C. Circuit in *Trump*, the court in *Carmichael* looked to *Nebraska Press* to formulate the same three-factor test.

"First, the court must consider whether the requested order is narrowly tailored." *Id.* at 1293 (citations omitted). "Second, the court must consider

18

whether less burdensome alternatives would achieve the government's objective." *Id.* at 1293 (citations omitted). As for the third factor, the district court observed that there was a three-way circuit split concerning the "threshold standard for imposing a prior restraint." *Id.* (citations omitted).

> The United States Courts of Appeals for the Sixth, Seventh, and Ninth Circuits have held that, before the court may issue an order restricting the speech of trial participants, it must find that the speech at issue presents a "clear and present danger" or a "serious and imminent threat" to a fair trial. *See United States v. Ford*, 830 F.2d 596, 598, 600 (6th Cir. 1987); *Levine v. U.S. Dist. Court for Cent. Dist. of California*, 764 F.2d 590, 595 (9th Cir. 1985); *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 249 (7th Cir. 1975). The Courts of Appeals for the Third and Fifth Circuits have adopted the "substantial likelihood of material prejudice" standard. *United States v. Scarfo*, 263 F.3d 80, 94 (3d Cir. 2001); *United States v. Brown*, 218 F.3d 415, 427. The Fourth and Tenth Circuits have held that the appropriate standard is "reasonable likelihood" of prejudice. *In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984); *United States v. Tijerina*, 412 F.2d 661, 666 (10th Cir. 1969). The Eleventh Circuit has not addressed this issue. *See United States v. Scrushy*, 2004 WL 848221, at *2 (N.D. Ala. 2004) (Bowdre, J.).

*Id.* The court pointed out that the protective order was asymmetric; in other words, it only burdened Carmichael. *Id.* The court also determined that *Ford* was the most analogous case, and found that the " 'serious and imminent threat' standard" was the most appropriate test to employ, and held

> [T]hat it cannot issue the protective order sought by the United States unless (1) Carmichael's website poses a serious and imminent risk to the court's ability to conduct a fair trial, (2) the proposed protective order is narrowly tailored, (3) alternatives to the protective order would not be effective, and (4) the order would be effective in achieving the government's objective.

19

*Id.* at 1294. The court went through each of the four factors and declined to issue the protective order. *Id.* at 1295–96, 1296.

The court reasoned that order wasn't "necessary to prevent a serious and imminent risk of harm to witnesses or deter[ ] future witnesses from cooperating with the government." *Id.* at 1295. There was insufficient evidence that naming the informants and including their pictures on the internet jeopardized their safety. *Id.* at 1295–96. The court also determined that the website wouldn't deter witnesses from cooperating with the government and that such evidence was scant at best and barely circumstantial that one of the witnesses was purportedly "scared off." *Id.* at 1296. What's more, the court also found that the website didn't pose a serious and imminent risk of safety for the undercover agents because they were only named on the website but never depicted. *Id.* Mr. Ryan's case and the gag order that the Court imposed here doesn't even come close to protective order that the government sought in *Carmichael*.

In sum and substance, the Court committed fundamental error by issuing the gag order from the start. It's far too sweeping. And the conditions that the Court added, creating further restraints on Mr. Ryan's speech not only compounds the error but makes the order ever more sweeping. The imposition of the gag order isn't justified by a sufficiently serious risk of prejudice to the judicial proceedings, there's no need to consider less restrictive alternatives, and

20

the gag order isn't narrowly tailored to address the potential prejudice to the judicial proceedings—none that are apparent—in the slightest. The gag order is unconstitutional in fact, in application, and is contrary to established law. The Court must vacate the gag order restraining Mr. Ryan's speech as a violation of his First Amendment rights to free speech. But the constitutional violations don't stop there. The gag order also violates Mr. Ryan's rights under the Fifth and Sixth Amendments.

IV.   **The gag order violates Mr. Ryan's due process rights under the Fifth Amendment.**

The Fifth Amendment's Due Process Clause prohibits pretrial release conditions under 18 U.S.C. § 3142 that amount to punishment prior to adjudication of guilt. *Cf. Jacoby v. Baldwin Cnty.*, 835 F.3d 1338, 1344 (11th Cir. 2016) (citing *Bell v. Wolfish*, 441 U.S. 520535n.16 (1979)). A condition of pretrial release is permissible if it's reasonably related to a legitimate government purpose, such as ensuring the safety of the community or preventing witness intimidation, and is not imposed for the purpose of punishment. *Cf. Jacoby*, 835 F.3d at 1345 ("[W]hether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate government purpose.") (quoting *Magulta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004)). As a matter of substantive due process then, *Bell* creates a two-part test: (1) "a court must ask

21

whether any 'legitimate goal' was served" by the pretrial release conditions; and (2) "it must ask whether the conditions are 'reasonably related' to that goal." *Jacoby*, 835 F.3d at 1345. Simply stated, there is no legitimate goal being served here in Mr. Ryan's case and the conditions that the Court had already imposed in its initial gag order, and later expanded more recently here in Tampa, isn't reasonably related to any kind of goal whatsoever. For these reasons, the gag order should be vacated as a violation of Mr. Ryan's Fifth Amendment rights to due process. Finally, the gag order is also violative of his rights under the Sixth Amendment.

### V.   The gag order violates Mr. Ryan's Sixth Amendment rights.

The Sixth Amendment guarantees a defendant the right to a fair trial, including the right to present witnesses and evidence in their defense, as well as the right to confront witnesses against them. A gag order that broadly prohibits a defendant from investigating trial participants or witnesses infringes upon these rights if it prevents the defendant from gathering evidence or preparing a defense. Courts have recognized that the right to compulsory process and to present evidence is fundamental to due process and the Sixth Amendment. *See Taylor v. Singletary*, 122 F.3d 1390 (11th Cir. 1997), *United States v. Hurn*, 368 F.3d 1359 (11th Cir. 2004). For the same reasons and arguments discussed above, the Court's gag order doesn't serve any kind of legitimate purpose, isn't the least

22

restrictive condition necessary to achieve that purpose, and interferes with core Sixth Amendment principles for Mr. Ryan to investigate his case on his own, to gather evidence, to prepare his own defense, and to assist his lawyer in defending the charge against him.

## VI.   Conclusion.

The law is clear: the Court's gag order (Doc. 26) restraining Mr. Ryan from searching or posting about the victims, the witnesses, the judicial officers, the prosecutors, and law enforcement, including each of their respective family members, is unconstitutional under the First Amendment. It's not only *presumptively* unconstitutional, but it's also *patently* unconstitutional as a matter of law. There's no serious risk to the judicial process, the less restrictive alternative is eliminating the gag order in its entirety, and the gag order sweeps much to broadly. It chills—nay freezes—his speech against these persons entirely.

The Court's gag order is also unconstitutional on Fifth and Sixth Amendment grounds. It's a violation of his due process rights and serves no legitimate purpose and is entirely punitive and arbitrary. It's also a violation of his rights to investigate his defense and assist himself and his counsel to defend his case. Mr. Ryan respectfully requests that the Court vacates this blatantly unconstitutional gag order.

23

Respectfully submitted on March 30, 2026.

**CHARLES L. PRITCHARD, JR.**
**FEDERAL DEFENDER**

*/s/ Stephen Consuegra*
Stephen Consuegra
Florida Bar No. 105816
Assistant Federal Defender
400 N. Tampa Street, Suite 2700
Tampa, Florida 33602
Phone: (813) 228-2715
Fax: (813) 228-2562
E-mail: Stephen_Consuegra@fd.org

24

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 30, 2026, a true and correct copy of the

foregoing was furnished using the CM/ECF system with the Clerk of the Court,

which will send notice of the electronic filing to the following:

AUSA Abigail King.

/s/ Stephen Consuegra
Stephen Consuegra
Assistant Federal Defender