UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

     v.                                     Case No.: 8:26-cr-41-TPB-CPT

JEREMY RYAN

_____/

**O R D E R**

Before the Court is Defendant Jeremy Ryan's construed motion to modify release conditions recently imposed on him that restrict his ability to perform internet searches and make posts about victims, witnesses, and trial participants in this case. (Doc. 29). After careful consideration of the matter, the Court grants Mr. Ryan's construed motion in part and denies it in part.

I.

In December 2025, Mr. Ryan was charged in the Middle District of Florida by way of a criminal complaint with transmitting in interstate commerce a threat to injure in violation of 18 U.S.C. § 875(c). (Doc. 1). According to the complaint, this charge stemmed from a business investment dispute in the cryptocurrency industry involving Mr. Ryan and two other individuals identified in the complaint as Victim 1 and Witness 1. *Id.* At the time of the alleged offense, Mr. Ryan was residing in San Diego, California, while Victim 1 was living in the Middle District of Florida.

As alleged in the complaint, Mr. Ryan initially participated in a group chat with Victim 1 and Witness 1, in which—over the course of three days—he became increasingly aggressive and threatening towards them, apparently because he believed that Victim 1 should have done a better job of examining the finances for a recent deal. *Id.* By way of example, Mr. Ryan sent Victim 1 a message in mid-October 2025 stating that he "tried to be nice but the favor ha[d]n't been returned," that "[Victim 1] and [his wife] got [sic] families," and that did Victim 1 "really want [Mr. Ryan] to cross that line?" *Id.* Mr. Ryan allegedly warned Witness 1 in another message that Witness 1's minor children were "safe because [Mr. Ryan did not] involve kids in [his] affairs . . . [b]ut [sic] [that he would not] drop them so 12–15 years from [then] . . . that calculus m[ight] change[.]" *Id.* Mr. Ryan also purportedly informed Victim 1 and Witness 1 in a separate message that although they had never provided him with the names of their family members, he was able to compile a list of several of their loved ones in "just [five] minutes." *Id.*

As part of the group chat as well, Mr. Ryan allegedly sent a photo of his California driver's license indicating that his middle name was "NoFucks," which—according to the complaint—is slang for a person who does "not care about the repercussions or consequences of [his] actions." (Doc. 1). Mr. Ryan additionally sent Victim 1 a map showing his location relative to Victim 1's last known business address, with the ominous comment that he and Victim 1 "[were]n't real far away[.]" *Id.*

Victim 1 perceived this communication as a form of intimidation aimed at illustrating how near the two lived to each other. *Id.*

As a further example, as part of the group chat, Mr. Ryan allegedly forwarded a news article to Victim 1 about violence involving the Crips gang in Los Angeles and claimed that a leader of the Crips followed Mr. Ryan on Instagram. *Id.* Mr. Ryan purportedly added that while he "d[idn't] fight with violence[,]" he could not "control what other people d[id] once [he] drop[ped Victim 1's] name as a dirty rotten scammer." *Id.*

These threats allegedly made by Mr. Ryan left Victim 1 in fear for his own safety and that of his family and caused Victim 1 to alter his daily routine. (Doc. 1). It also led Victim 1 to cease conversing with Mr. Ryan directly and to communicate with Mr. Ryan only through Witness 1. *Id.*

Despite these steps taken by Victim 1, Mr. Ryan allegedly persisted in harassing and menacing both Victim 1 and Witness 1 in the ensuing weeks. In a series of messages during this period, for instance, Mr. Ryan purportedly told Witness 1, among other things, "to give [Mr. Ryan] one reason why [he] shouldn't fuck up [Victim 1] and [Victim 1's] family." *Id.* Mr. Ryan additionally advised Witness 1 in a different message that while he would not "call a hit on [Victim 1 because] death [wa]s too easy" for Victim 1, he "guarantee[d]" that Victim 1 would "wish [he] did." *Id.*

After this exchange, Mr. Ryan allegedly made "various extortionate threats" to Witness 1 which were directed at Victim 1. *Id.* In one message in early December 2025, for example, Mr. Ryan insisted that Witness 1 "be ready to abandon the people who got [him] here" (presumably referring to Victim 1) and that if Witness 1 did not heed this directive, Mr. Ryan "guarantee[d]" Witness 1 that he would "die a screaming ass piece of shit like the rest of [his] team." *Id.* Mr. Ryan purportedly doubled down on this warning the next day, telling Witness 1 that he "need[ed] to do some deep thinking on how to proceed" and that Mr. Ryan would "hunt [Witness 1] down for years to come if [Witness 1] continue[d] down [his] current path." (Doc. 1).

Mr. Ryan also did not limit his hostile behavior solely to Witness 1 and Victim 1. According to the government, for example, Mr. Ryan contacted classmates of Victim 1's daughter in an effort to slander Victim 1's name. (Doc. 30 at 2).

On January 22, 2026, Mr. Ryan was arrested in the Southern District of California based on the criminal complaint. *United States v. Ryan*, 3:26-mj-139-BJW, (Doc. 3) (S.D. Cal. 2026). At his initial appearance on the complaint, the court in the Southern District of California continued the hearing until January 27, 2026, so that Mr. Ryan could secure the requisite medical clearance to attend the proceeding. *Id.* On January 30, 2026, in response to a motion brought by the government, the court directed that Mr. Ryan be detained without prejudice on the ground that he posed both a danger to the community and a flight risk. *See id.* at (Doc. 13). To buttress this finding, the Court pointed to, inter alia, the nature and circumstances of the charged

offense, the weight of the evidence against Mr. Ryan, Mr. Ryan's significant mental health history, and Mr. Ryan's criminal history. *Id.* That criminal history included—per the Pretrial Services Report—convictions for maintaining a drug trafficking place, unlawfully using a phone to threaten with a concealed identification, threatening injury or harm via a computer message, and receiving/altering/dispersing nuclear material. Of note here, Mr. Ryan was detained pending trial on the latter charge despite his repeated attempts to gain his freedom and violated the terms of his supervised release once he completed his prison sentence on that charge by committing a new crime.

In early February 2026, a federal grand jury sitting in the Middle District of Florida returned an indictment charging Mr. Ryan with one count of cyberstalking in violation of 18 U.S.C. § 2261A(2). (Doc. 3). In support of this charge, the indictment alleged, inter alia, that over a roughly two-and-a-half month period in late 2025, Mr. Ryan—acting with the intent to kill, injure, harass, and intimidate Victim 1—used a computer or other facility of interstate commerce to engage in a course of conduct that placed Victim 1 in reasonable fear of death or serious bodily injury and that caused substantial emotional distress to Victim 1, his family member(s), and his spouse. *Id.*

Roughly two weeks after the return of this indictment, Mr. Ryan asked the court in the Southern District of California to reconsider its detention Order apparently due to his medical conditions and his inability to receive appropriate care at the local facility where he was then being housed. *See Ryan*, No. 3:26-mj-139-BJW, (Doc. 15);

*see also* (Doc. 30 at 3).  The court in the Southern District of California granted that request and subsequently released Mr. Ryan subject to a number of restrictions, including—of import here—that he be confined to his home with location monitoring; that he not dox Victim 1, Witness 1, their family members, law enforcement, and the prosecutors involved in the case;[1] that he not have any contact with Victim 1, Witness 1, and their family members; that he "[p]articipate in the 'Computer Monitoring Program';" that he "not use/access any computer without monitoring software installed, unless approved in advance by Pretrial Services;" and that he "not access any online computer service or any other device with internet capabilities . . . at any location [and] at any time[.]"  *Ryan*, No. 3:26-mj-139-BJW, (Doc. 17).  The court amended these release conditions a week later to permit Mr. Ryan to access one device and to prohibit him from contacting Victim 1's companies and any agencies contracting with those entities.  *Ryan*, No. 3:26-mj-139-BJW (Doc. 21); *see also* (Doc. 30 at 3).  Mr. Ryan did not appeal these conditions.

Within days of being allowed to use a device with internet capabilities, the computer monitoring program installed on the device alerted the Pretrial Services office in the Southern District of California that Mr. Ryan sent a message to an individual, which indicated he was trying to circumvent his computer-related release

---

[1] Doxing (also referred to as doxxing) "is the non-consensual online posting of private or personally identifying information about an individual."  Liane M. Jarvis Cooper, *Social Media and Online Persecution*, 35 GEO. IMMIGR. L. J. 762–63 (2021).

conditions. (Doc. 30 at 5). In this message, Mr. Ryan advised the individual that he was looking "to find some work[-]around," adding that it was "not against [his] conditions so [he] just . . . [had to] find something this software ha[d]n't blocked" and that "technically [his] conditions only sa[id he could] not harass law enforcement and prosecutors." *Id.* That same day, Mr. Ryan messaged another individual to "show up" at a female's "door with a fifth of henny [sic] in one hand and a meat cleaver in the other and say either way you're mine[,] take your pick." *Id.*[2]

In the days that followed, Mr. Ryan began conducting searches to see if court personnel and prosecutors in this case were involved in any controversies or had any ties to Jeffrey Epstein. *Id.* Mr. Ryan also sent a message to an individual about Victim 1's residential location and communicated with a different person about the children of Victim 1 or Witness 1. (Doc. 30 at 4). In addition, Mr. Ryan consulted ChatGPT as to whether he could post about someone he was prohibited from contacting and used a social media account under a pseudonym to post about Witness 1. *Id.*

Even though the Pretrial Services office contacted Mr. Ryan about these troubling posts, he nonetheless messaged various individuals through social media several days later about Witness 1's children. *Id.* And in early March 2026, Mr. Ryan sent a separate individual a message again referring to evading the doxing restriction.

---

[2] It is not clear the female to whom Mr. Ryan was referring. (Doc. 30 at 5).

*Id*. In that communication, Mr. Ryan inquired "[p]lus who would we doxx?" and remarked that "[t]echnically . . . [he was] only banned from doxing prosecutors, law enforcement, or anyone named in the case. . . . Technically[.]" *Id.*

Concerned about Mr. Ryan's dogged efforts to skirt his release conditions and the potential threat his online activities posed to Victim 1, Witness 1, and others, the Court convened an in-person hearing at the federal courthouse in Tampa, Florida on March 19, 2026, to address the matter.[3] (Docs. 22, 23, 24). At that proceeding, the Court reviewed a memorandum prepared by the Pretrial Services office in the Southern District of California that referenced Mr. Ryan's disturbing posts and searches, and the Court also took testimony from Mr. Ryan's Pretrial Services officer about Mr. Ryan's behavior. In addition, the Court explained to the parties that its discomfort with Mr. Ryan's conduct and its desire to protect the victims and witnesses in the case prompted it to wait to discuss the memorandum with the parties until the day of the hearing. The Court, however, afforded Mr. Ryan ample time at the hearing to review the memorandum and the underlying evidence, and proceeded with the hearing only after Mr. Ryan assured the Court that he and his counsel were ready to move forward.

---

[3] The Court required that Mr. Ryan be present at this hearing because it anticipated—correctly as it turns out—that the proceeding would "involve the taking of testimony and other evidence." (Doc. 19); *see also* Fed. R. Crim P. 43 (dictating when a criminal defendant's presence is required and not required).

Towards the end of the hearing, the Court informed the parties of the further conditions it was contemplating imposing on Mr. Ryan to limit his online activities as they related to the participants in the case. These new restrictions included the following:

> [Mr. Ryan] shall not conduct any internet searches or make any posts relating to the victims in this case and their families, the witnesses in this case and their families, the victims' or witnesses' businesses/companies or any entities or persons contracting with the victims' or witnesses' businesses/companies, law enforcement and prosecutors involved in this case and their families, and judicial officers involved with this case and their families[.]

(Doc. 26).

Although defense counsel initially seemed receptive to these "search and post" conditions provided that they contained certain "carve outs," he ultimately took the position that all the restrictions violated the First Amendment. In response to this contention, the Court directed the parties to brief the issue. The parties have since done so (Docs. 29, 30), and the matter is thus now ripe for the Court's consideration.

## II.

Under the Bail Reform Act of 1984, a judicial officer may detain a defendant pending trial if the judicial officer finds there is no condition or combination of conditions that will reasonably assure the defendant's appearance as required and the safety of any other person or the community. 18 U.S.C. § 3142(e)(1). Absent such a finding, a judicial officer must release a defendant subject to the least restrictive

condition or combination of conditions that will reasonably ensure the defendant will neither flee nor pose a danger to the community.  18 U.S.C. § 3142(c)(1).  In rendering this determination, a court must take into account the "available information" regarding (1) the nature and circumstances of the charged offense, including whether the offense is a crime of violence; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would attend the defendant's release.  18 U.S.C. §§ 3142(g)(1)–(4).  The judicial officer may modify the release conditions he imposes at any time.  18 U.S.C. § 3142(c)(3).

In his submission, Mr. Ryan mainly challenges the Court's search and post restrictions on three grounds.  First, he contends that these conditions constitute an unjustified prior restraint on his right to free speech in violation of the First Amendment.  (Doc. 29).  Second, he asserts that they contravene his rights under the Fifth Amendment because they are not reasonably related to a legitimate government purpose.  *Id*.  Third, he claims that they trammel his Sixth Amendment rights because they interfere with his ability to investigate his case, gather evidence, and otherwise assist his counsel in preparing his defense.  *Id*. at 23.  Each of the arguments will be addressed in turn.

A.

Mr. Ryan's First Amendment challenge relies primarily on the D.C. Circuit's ruling in *United States v. Trump*, 88 F.4th 990 (D.C. Cir. 2023).  In that case, the

defendant, Donald Trump, was being prosecuted by the Special Counsel "for conspiring to overturn the 2020 presidential election through unlawful means and for obstructing the election's certification." *Id*. at 996. Soon after the commencement of the prosecution, Mr. Trump—who was then a presidential candidate—"posted multiple statements on his social media account attacking potential witnesses in the case, the judge, and the Special Counsel and his staff[.]" *Id*. In response to these posts, the district court issued an order "restraining the parties and their counsel from making public statements that 'target' the parties, counsel and their staffs, court personnel, and 'any reasonably foreseeable witness or the substance of their testimony.'" *Id*. The district court subsequently added that its order "did not prohibit 'statements criticizing the government generally, including the current administration or the Department of Justice; statements asserting that [Mr. Trump wa]s innocent of the charges against him, or that his prosecution [wa]s politically motivated; or statements criticizing the campaign platforms or policies of [Mr. Trump's] current political rivals[.]'" *Id*. at 999. The district court's order also did not forbid "statements targeting the court or the judge herself." *Trump*, 88 F.4th at 999.

Mr. Trump promptly appealed the district court's order, claiming that it ran afoul of the First Amendment. *Id*. at 996. In addressing Mr. Trump's appeal, the D.C. Circuit observed at the outset that the matter involved the intersection of "[t]wo foundational constitutional values:" a person's "right to free speech and the fair and effective functioning of the criminal trial process and its truth-finding function." *Id*. at

11

1002.  Of significance here, the court emphasized as to the latter value that the "primary constitutional duty of the Judicial Branch [is] to do justice in criminal prosecutions," and that judges "have an ongoing obligation to ensure that speech about a criminal case does not divert the trial" from this core concern.  *Id.* at 1004 (internal quotation marks and citations omitted).  The D.C. Circuit additionally highlighted that "the Constitution affords judges broader authority to regulate the speech of trial participants," and that—when warranted—courts must "'proscribe extrajudicial statements by any lawyer, *party*, witness, or court official' engaging in 'prejudicial' communications."  *Id.* at 1005 (emphasis added) (citations omitted).  The D.C. Circuit further pointed out that "the law has long recognized . . . [a] district court's authority to control the speech and conduct . . . of defendants in criminal trials when necessary to protect the criminal justice process," and that criminal defendants "are frequently subjected to 'substantial liberty restrictions . . . [which] commonly include measures that burden criminal defendants' ability to act, associate, and speak.'"  *Id.* at 1006 (quoting *United States v. Salerno*, 481 U.S. 739, 749 (1987)).

Against this backdrop, the D.C. Circuit applied a three-part test for analyzing Mr. Trump's First Amendment argument: (1) whether Mr. Trump's contested speech posed a significant and imminent threat to the administration of criminal justice;[4] (2) whether there were less restrictive alternatives that would adequately address this risk;

---

[4] The D.C. Circuit assumed without deciding that this "most demanding" standard should be utilized in examining the district court's order.  *Id.* at 1008.

and (3) whether the district court's order was narrowly tailored, including whether it effectively addressed the potential prejudice. *Trump*, 88 F.4th at 1008–1009 (internal quotation marks and citations omitted). While the D.C. Circuit found that the district court's order cleared the first two hurdles, it determined that the order fell short on the third because it "reach[ed] too far." *Id*. at 1019. In support of this assessment, the court noted, inter alia, that the district court's order should have "focus[ed] more directly and narrowly on comments that speak to or are about [known or reasonably foreseeable witnesses'] . . . potential participation in the investigation or in [the] criminal proceeding." *Id*. at 1021. The D.C. Circuit ruled that the protections afforded to counsel and staff working on the case also "require[d] some recalibration to sufficiently accommodate free speech." *Id*. at 1024. To that end, the court added a "mens rea requirement," which necessitated that the disputed speech be made with "the intent to materially interfere with the[ ] work [of counsel and staff] or the knowledge that such interference [wa]s highly likely to result." *Id*. at 1026. In sum, the D.C. Circuit affirmed the district court's order:

> to the extent it prohibit[ed] all parties and their counsel from making or directing others to make public statements about known or reasonably foreseeable witnesses concerning their potential participation in the investigation or in th[e] criminal proceeding[; and also] . . . to the extent it prohibit[ed] all parties and their counsel from making or directing others to make public statements about—(1) counsel in the case other than the Special Counsel, (2) members of the court's staff and counsel's staffs, or (3) the family members of any counsel or staff member—if those statements [were] made with the intent to materially interfere with, or to cause others to materially interfere with, counsel's or staff's work in th[e]

13

criminal case, or with the knowledge that such interference [wa]s highly likely to result.

*Trump*, 88 F.4th at 1027–28.

There are reasons to view the *Trump* decision as having less application here given the unique circumstances present in that action. Unlike Mr. Ryan, for instance, Mr. Trump was "a former President and . . . candidate for the presidency" at the time he was being prosecuted by the Special Counsel. *Id*. at 1028. As such, his case necessarily implicated political speech, which "is the lifeblood of American democracy" and which deserves "the strongest form of First Amendment protection." *Id*. at 1002, 1022 (citations omitted); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("No form of speech is entitled to greater constitutional protection" than "[c]ore political speech."); *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) ("[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.") (internal quotation marks and citations omitted). As another example, in contrast to the election interference crimes brought against Mr. Trump, the offense charged in this action—cyberstalking—is itself a crime of violence according to many courts. *See*, *e.g.*, *United States v. Bacon*, 2021 WL 5051364, at *13 (D. Del. Nov. 1, 2021) (concluding that "cyberstalking is . . . a crime of violence"); *United States v. Harrison*, 354 F. Supp. 3d 270, 278 (W.D. N.Y. 2018) (deeming cyberstalking to be a crime of violence under the Bail Reform Act); *United States v. Grooms*, 2015 WL 1982097, at *2 (S.D. W. Va.

Apr. 29, 2015) (same); *United States v. Shrader*, 2010 WL 503092, at *3 (S.D. W. Va. Feb. 8, 2010) (same); *United States v. Neuzil*, 2009 WL 2030373, at *2 (N.D. Iowa July 13, 2009) (same).

Notwithstanding these and other material differences between the *Trump* case and this prosecution, the three-pronged test employed by the D.C. Circuit in *Trump* is instructive. As both Mr. Ryan and the government rely on this analytical framework in making their arguments, the Court will assume without deciding that this framework is appropriate to use here.[5]

The first part of that test—as noted above—is whether Mr. Ryan's research and posts about victims, witnesses, and others associated with his prosecution pose a significant and imminent threat to the administration of criminal justice. After careful review, the Court has little trouble finding that these online activities readily cross this threshold, as they are often replete with threats, attacks, and intimidation that could negatively affect the willingness of individuals—especially the victims and witnesses— to participate in this case. *See Sheppard v. Maxwell*, 384 U.S. 333, 359 (1966) (underscoring the trial court's obligation to "insulate[ ] the witnesses" from external communications that could affect their testimony); *Trump*, 88 F.4th at 1012 ("The law

---

[5] Mr. Ryan also cites *United States v. Carmichael*, 326 F. Supp. 2d 1267 (N.D. Ala 2004) in support of his First Amendment challenge. The court in *Carmichael* relied on a similar tripartite approach in examining whether the government could order a defendant to take down an internet website which the government contended threatened and harassed its witnesses and agents. *Id*. at 1270, 1294. The Court applies the *Trump* standard in this case given its recency and its well-developed underpinnings.

has long recognized the importance of shielding witnesses from external influences that undermine the integrity of the trial process."); *see also id.* at 1020 ("The interest in protecting witnesses from intimidation and harassment is doubtless compelling."). In fact, as detailed above, Victim 1 has made clear that he is fearful of Mr. Ryan and the harm Mr. Ryan might inflict on his family.

Furthermore, "[t]he undertow generated by . . . [Mr. Ryan's research and posts] does not stop" with the victims and witnesses. *Trump*, 88 F.4th at 1013. They are "also highly likely to influence other" persons involved in this prosecution, including counsel and staff. *Id.* at 1013–14 ("[C]ertain speech about counsel and staff working on the case poses a significant and imminent risk of impeding the adjudication of this case."). "Courts have a legitimate interest in protecting [the] judicial system from [outside] pressures, including protecting court officers from conscious[ ] or unconscious [outside] influence[.]" *Id.* at 1014 (alterations in original) (internal quotation marks and citation omitted). As the D.C. Circuit explained in *Trump*:

> Messages designed to generate alarm and dread, and to trigger extraordinary safety precautions, will necessarily hinder the trial process and slow the administration of justice. For example, trial personnel and participants will be distracted or delayed by objectively reasonable concerns about their safety and that of their family members, as well as by having to devote time and resources to adopting safety measures or working with investigators.

*Id.*

These concerns have currency here as well. Victim 1's fear of Mr. Ryan poses a substantial risk of prejudice to the administration of justice that extends to members of law enforcement and the court, particularly given Mr. Ryan's threats that underly his cyberstalking charge, his persistent attempts to evade the prohibition on doxing through "technicalities," and certain of his other online activities. It bears emphasizing in this regard that Mr. Ryan has searched for the locations and family members of both Victim 1 and Witness 1, and it is reasonable to believe that he would do the same for counsel and staff connected to his prosecution, especially if he perceived he was somehow wronged.

With respect to the second prong of the *Trump* analysis, there are no less restrictive alternatives that would sufficiently address this risk. Through his actions to date, Mr. Ryan has evidenced an intent to "push the envelope" to exploit any ambiguities—or, as he would call them, "technicalities"—in the Court's release Orders. Loosening these restrictions at this juncture would only afford him a greater opportunity to work-around the safeguards imposed by the Court to protect against the undue influence Mr. Ryan might exert on witnesses, trial participants, and staff in this matter. As a result, Mr. Ryan's "self-regulation" is not a viable option for the Court to invoke in lieu of restraining his speech. *Trump*, 88 F.4th at 1017 ("Self-regulation is . . . one possible alternative for a court to consider before restraining speech.") (citation omitted).

The same can be said of the other available measures identified by the D.C. Circuit in *Trump*—namely, "questioning prospective jurors, instructing seated jurors to ignore extrajudicial statements, moving the trial to a different location, and postponing the trial." *Id.* (citation omitted). To paraphrase the court in *Trump*:

> Th[e]se measures . . . would do nothing to prevent or redress the harm to witnesses' participation or to staff . . . [exposed to] threats or harassment. If a witness's testimony were to change, or if a reluctant potential witness were to decide not to come forward because of [Mr. Ryan's research and posts], no amount of questioning or instructing jurors could undo that harm. Likewise, if court and prosecution staff are diverted from their work by the need to take extra safety precautions to protect themselves and their families, or are distracted by the burdens of constant vigilance, none of the proposed measures . . . would mitigate that interference.

*Id.*

This brings the Court to the third and final prong—namely, whether the Court's search and post limitation is narrowly tailored. On this issue Mr. Ryan has a point. After careful consideration of the matter, the Court is persuaded by the D.C. Circuit's analysis in *Trump* that it can tighten the search and post condition without impeding the administration of justice or endangering the community. Borrowing from the language crafted by the D.C. Circuit in *Trump*, the Court hereby modifies its search and post restriction as follows:

> [Mr. Ryan] shall not conduct any internet searches or make any posts or direct others to conduct any internet searches or make any posts about (a) the victims in this case—including, but not limited to, Victim 1— concerning their potential participation in the investigation or in this criminal proceeding or their families; (b) known or reasonably

18

foreseeable witnesses—including, but not limited to, Victim 1 and Witness 1— concerning their potential participation in the investigation or in this criminal proceeding or their families; and/or (c) counsel in the case (other than the U.S. Attorney for the Middle District of Florida and the Department of Justice), members of the court's staff and counsels' staff, or the family members of any counsel or staff member *if* the internet research and posts are made with the intent to materially interfere with, or to cause others to materially interfere with, counsel's or staff's work in this criminal case, or with the knowledge that such interference is highly likely to result.[6] Mr. Ryan shall also not conduct any internet research regarding the location of the judges assigned to this case or any research regarding the judges' families.[7]

As should be clear, but to avoid any potential doubt, nothing in this modified language alters the no doxxing and no contact restrictions imposed by the court in the Southern District of California. Nor do any of these prohibitions apply to Mr. Ryan's counsel, who is a barred attorney subject to the rules and ethical guidelines that govern all lawyers.

One final comment on Mr. Ryan's First Amendment challenge is warranted. It seems that absent Mr. Ryan's medical condition, he would have remained detained by the court in the Southern District of California and would likely have had no internet access to conduct research and make posts. *See United States v. Waddell*, 151 F. Supp.

---

[6] Mr. Ryan's counsel conceded at the March 19 hearing that Mr. Ryan had no proper basis to research or post about any of the participants' family members, including counsel's own.

[7] The Court can conceive of no legitimate reason why Mr. Ryan would need to research the judges' whereabouts or their families, and such a restriction is necessary to address an obvious "danger," especially since the charged conduct was allegedly committed "through the use of the internet." *United States v. Mullane*, 2025 WL 2977896, at *5 (D. Mass. Oct. 22, 2025) (collecting cases).

3d 1317, 1319 n.2 (S.D. Ga. 2015) (noting that a defendant incarcerated before trial was "entitled to *no* internet access") (citations omitted); *see also Ryan*, No. 3:26-mj-00139-BJW, (Doc. 17) (prohibiting Mr. Ryan from using "any online computer service or any other device with internet capabilities"). Notwithstanding this apparent reality, the Court has undertaken great care here to craft a set of research and post conditions that balance the "[t]wo foundational constitutional values" at issue—Mr. Ryan's "right to free speech and the fair and effective functioning of the criminal trial process and its truth-finding function." *Trump*, 88 F. 4th at 1002.

B.

Mr. Ryan's next challenge, as referenced previously, is that the Court's search and post restriction violates his Fifth Amendment substantive due process rights because it amounts to punishment before an adjudication of guilt. (Doc. 29 at 21–22). Mr. Ryan also asserts that this restriction is not reasonably related to any legitimate government interest. *Id.* at 22.

The problem with these contentions is that the cases upon which Mr. Ryan relies to bolster them—*Jacoby v. Baldwin Cnty.*, 835 F.3d 1338 (11th Cir. 2016) and *Bell v. Wolfish*, 441 U.S. 520 (1979)—are inapposite. Both of these decisions involve defendants who were detained prior to trial and not defendants like Mr. Ryan who are on pretrial release. *See Jacoby*, 835 F.3d at 1347; *see also Bell*, 441 U.S. at 523. Further, the opinions recognize that preserving the "safety" and "security" of individuals with whom a pretrial defendant might interact—such as Victim 1 and Witness 1—is a

20

legitimate government interest that justifies imposing pretrial restrictions. *See Jacoby*, 835 F.3d at 1350; *see also Bell*, 441 U.S. at 546–47.

Mr. Ryan does not cite, nor is the Court aware of, any binding or persuasive authority addressing the intersection between substantive due process and pretrial release conditions, particularly as it relates to internet access. *See, e.g.*, (Doc. 30 at 12). In light of this dearth of decisional law, the Court declines to expand substantive due process to encompass such online activity. *See Taylor v. Nocco*, 2024 WL 3678322, at *36 (M.D. Fla. Mar. 24, 2024) ("The Supreme Court has warned courts not to expand the concept of substantive due process because the 'guideposts for responsible decision[ ] making in this uncharted area are scarce and open-ended' and 'judicial self-restraint requires [courts] to exercise the utmost care.'") (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). Accordingly, Mr. Ryan's substantive due process challenge fails.

## C.

Mr. Ryan's final challenge—as mentioned earlier—is that the Court's search and post condition contravenes his Sixth Amendment rights because it interferes with his ability to investigate his case, gather evidence, and otherwise assist his counsel in preparing his defense. (Doc. 29 at 22–23). Mr. Ryan, however, does not delineate the specific language in the Sixth Amendment upon which this challenge is predicated, *cf. Hickman v. Ryan*, 2009 WL 4730854, at *38 n.11 (D. Ariz. Dec. 1, 2009) (rejecting a habeas corpus petition premised on the Sixth Amendment where the petitioner "d[id]

not develop . . . which aspect of the Sixth Amendment he claims was violated"), nor does he reference any case authority that supports it.

Even putting aside these deficiencies, Mr. Ryan's Sixth Amendment argument lacks merit in any event.  This is because there is no part of the Court's research and post restriction that precludes his counsel from scrutinizing the governing legal authority or making the requisite factual inquiries in his case.  *See United States v. Tift*, 2025 WL 1530514, at *1 (W.D. Wash. May 29, 2025) (noting that if a pro se defendant cannot "access the internet[,] . . . he may seek assistance from . . . his standby counsel" to research his case).  Indeed, Mr. Ryan's attorney is duty-bound under the Sixth Amendment to engage in "reasonable investigations" or to render "a reasonable decision that makes particular investigations unnecessary."  *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 691 (1984)); *see also Wiggins v. Smith*, 539 U.S. 510, 527 (2003) (noting that "assessing the reasonableness of an attorney's investigation" necessitates that a court consider "evidence already known to counsel[, including from sources like his client, and] also whether the known evidence would lead a reasonable attorney to investigate further"); *Carmichael*, 326 F. Supp. 2d at 1298 (acknowledging that a defendant's lawyer is obligated to conduct a "reasonable investigation").[8]

---

[8] Mr. Ryan also ignores the fact that there are statutes and case law which allow for the imposition of internet usage conditions on defendants on pretrial release.  *See, e.g.*, *United States v. Pako*, 2021 WL 2603759, at *5 (S.D. Fla. June 24, 2021) (finding a prohibition on internet use adequately mitigated the risk of a defendant contacting minors on the internet).

Perhaps recognizing the flaws in his Sixth Amendment challenge, Mr. Ryan more recently argues—for the first time—that the Court's search and post restriction limits his employment as a citizen journalist and a non-fungible token artist and will cause him to become homeless. *See* (Doc. 35 at 4).[9] Without a meaningful showing buttressing this claim, there is reason to view it with a healthy dose of skepticism. For one, the search and post restriction does not prevent Mr. Ryan from engaging in journalism as it pertains to people or entities unrelated to this case. For another, the search and post restriction does not materially hamper Mr. Ryan's earnings potential because—according to his own attestations in multiple filings in other litigation—he does not derive a significant amount of money from these activities. As these filings demonstrate, the only regular income he collects is from social security. *See, e.g.*, *Ryan v. U.S. Marshals Serv.*, No. 3:26-cv-01517-TWR-MMP, (Docs. 1, 2, 5, 5-1 at 3) (S.D. Cal. Apr. 22, 2026) (averring that Mr. Ryan did not acquire any income from self-employment other than the $500 per month he was paid for "variable odd jobs"); *see also Ryan v. X Corp.*, No. 3:24-cv-3553-WHO, (Docs. 63, 69) (N.D. Cal. July 16, 2025) (attesting that Mr. Ryan's only source of income was social security).

Mr. Ryan also more recently contends—again for the first time—that he requires access to a second device for purposes of two-factor authentication. (Doc. 35

---

[9] Mr. Ryan does not explain why he did not raise this argument in the first instance with the judicial officer who imposed the contested condition.

at 4–5).[10] This claim too should be viewed with skepticism in the absence of persuasive evidence establishing that it is true. This is especially so because it is the Court's understanding that at least some methods of two-factor authentication can be utilized through a single device. And to the extent that Mr. Ryan claims that he needs to avail himself of a second device to participate in ongoing civil litigation he has initiated, *id.* at 4, there is good reason to believe such an assertion is unfounded. *Cf. Ryan*, No. 3:26-mj-139-BJW, (Doc. 21) (imposing a condition of pretrial release limiting Mr. Ryan to a single device in February 2026), *with Ryan v. Warden of MCC San Diego*, No. 3:26-cv-1516-JES-AHG, (Docs. 1, 2) (S.D. Cal. Mar. 10, 2026) (filing a civil complaint and moving to proceed in forma pauperis weeks after the one-device condition was imposed), *and with Ryan v. Best In Slot LLC*, No. 3:25-cv-2348-AGS-JAC, (Doc. 34) (S.D. Cal. April 8, 2026) (filing "acknowledgment of service" months after being limited to a single device).

III.

Based on the foregoing, Mr. Ryan's construed motion to modify his pretrial release conditions (Doc. 29) is granted in part and denied in part as set forth more fully herein.

---

[10] Mr. Ryan likewise does not explain why he did not raise this contention in the first instance with the judicial officer who imposed the disputed condition.

SO ORDERED in Tampa, Florida this 19th day of May 2026.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

Copies to:
Counsel of record